

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

**ENTERED**
**10/10/2008**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| GEORGE R. NEELY | § | |
| DEBTOR(S) | § | CASE NO.   04-44898-H5-7 |
| | § | |
| COMMISSION FOR LAWYER | § | |
| DISCIPLINE | § | |
| PLAINTIFF(S) | § | |
| | § | ADV. NO.   05-3503 |
| V. | § | |
| | § | |
| GEORGE R. NEELY | § | |
| DEFENDANT(S) | § | |

## MEMORANDUM OPINION

Before the Court is the complaint of the Commission for Lawyer Discipline objecting to debtor's discharge and to the dischargeability of its debt. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding. Following a trial, the Court concludes that George Neely's discharge is **DENIED** under both 11 U.S.C. §§ 523 and 727.

### I. Background

Debtor, George R. Neely, married Cindy Diane Blazik on May 30, 1998. The Neelys have two children with special needs, a son born in November 2001, and a daughter born in July 2004. Garnet and Helen Neely are George Neely's parents who live in Renton, Washington. Windell Neely is George Neely's brother, who lives in Renton, Washington.

George Neely filed a voluntary chapter 7 petition on October 19, 2004. W. Steve Smith is the chapter 7 trustee.  Neely's chapter 7 meeting of creditors was conducted on February 17, 2005.  Thereafter, Neely converted his case to chapter 13 on April 26, 2006, and it was reconverted to chapter 7 on January 16, 2007.  Neely's chapter 13 meeting of creditors was conducted on December 13, 2006, and  meeting of creditors upon reconversion to chapter 7 was conducted on June 5, 2007.

The Commission for Lawyer Discipline holds two judgments against Neely for his professional misconduct as an attorney in violation of the Texas Disciplinary Rules of Professional Conduct. In cause no. 2004-56561 in the 165th Judicial District Court of Harris County, Texas, the Commission was awarded judgment for attorneys fees in the amount of $14,320.00.  In cause no. 2005-56137 in the 333rd Judicial District Court of Harris County, Texas, the Commission was awarded judgment for attorneys fees in the amount of $20,000 plus costs and expenses in the amount of $3,350.00.  All fees and costs are to be remitted to the State Bar of Texas, Office of Chief Disciplinary Counsel.  At the time of trial of the instant matter, a third case for professional misconduct was pending, cause no. 2003-63182 in the 164th Judicial District Court of Harris County, Texas.  This Court found that Neely should be disbarred.

## II.  Contentions of the Parties

In the instant proceeding, the Commission for Lawyer Discipline seeks an adjudication that its judgments are not dischargeable under 11 U.S.C. § 523(a)(7).  Neely challenges

whether the Commission for Lawyer Discipline of the State Bar of Texas constitutes a "governmental unit" and whether the amounts awarded under the judgments it holds against debtor constitute a "fine, forfeiture or penalty." Instead, Neely contends that the amounts awarded are compensation for actual pecuniary loss under 11 U.S.C. § 523(a)(7).

The Commission further seeks denial of Neely's discharge under 11 U.S.C. § 727, alleging that Neely concealed property before and after he filed bankruptcy, made a false oath during his case, and withheld documents concerning his financial affairs. The Commission contends that Neely failed to adequately disclose information concerning his financial accounts, his interest in a patent, and his interests in real property located at 4503 Montrose, Houston, Texas, 705 Avondale, Houston, Texas, and 1925 FM 723, Rosenberg, Texas.

Neely contends that he has not made a false oath, has not failed to disclose property, and has not failed to turnover records. Neely alleges that he lost financial records in a flood that occurred during the summer of 2001, that a former office employee is responsible for any confusion, and that the real and personal property at issue is owned either by a trust benefitting his children or by Cindy Neely as her separate property.

### III. Bankruptcy Code § 523

Bankruptcy Code section 523 provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--
> . . . .
> (7) to the extent such debt is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss

11 U.S.C. § 523.

Under the Bankruptcy Code, a "governmental unit" includes a department, agency, or instrumentality of a state. 11 U.S.C. §101(27). The Commission for Lawyer Discipline is a standing committee of the Texas state bar. Tex. Gov't Code § 81.076(b). The Texas state bar is an administrative agency of the judicial department of the State of Texas. Tex. Gov't Code § 81.011(a). Consequently, the Commission is a governmental entity of the State of Texas. Tex. Gov't Code § 554.001.

The Texas Supreme Court has the power to regulate the practice of law in the State of Texas. <u>Acevedo v. Commission For Lawyer Discipline</u>, 131 S.W.3d 99 (Tex.App.-San Antonio 2004) (citing <u>In re State Bar of Texas</u>, 113 S.W.3d 730, 732 (Tex.2003)). Under its authority granted by Article II, Section 1 of the Texas Constitution and section 81.011(c) of the State Bar Act, the Texas Supreme Court promulgated the Texas Rules of Disciplinary Procedure. <u>Id</u>. Under these rules, a disciplinary proceeding is initiated by the filing of a disciplinary petition by the Chief Disciplinary Counsel in the name of the Commission for Lawyer Discipline. <u>Id.</u> (citing Tex.R. Disciplinary P. 3.01, reprinted in Tex. Gov't Code Ann., tit.2, subtit. G app. A-1 (Vernon 1998)). A disciplinary proceeding is not filed to redress a private wrong or a violation of the penal code but to hold a lawyer accountable for his professional misconduct. <u>Id</u>. (citing Tex.R. Disciplinary P. 1.06(C)).

The Court finds that the judgments awarding attorneys fees in favor of the Commission and against Neely in the disciplinary proceedings at issue are fines or penalties under 11

U.S.C. § 523. The Court further finds that the Commission for Lawyer Discipline is a governmental unit under 11 U.S.C. § 523. The Court further finds that such awards are not compensation for actual pecuniary loss. See In re Taggart, 249 F.3d 987 (9th Cir. 2001); In re Richmond, 378 B.R. 22 (D.N.H.2007). The Court concludes that the judgments in favor of the Commission for Lawyer Discipline against George R. Neely are not discharged pursuant to 11 U.S.C. § 523(a)(7).

### IV. Bankruptcy Code § 727

Bankruptcy Code § 727 provides:

(a) The court shall grant the debtor a discharge, unless–
. . . .
(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed--

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;
. . . .
(4) the debtor knowingly and fraudulently, in or in connection with the case--

(A) made a false oath or account;
. . . .
(D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs.

11 U.S.C. § 727.

Denial of discharge under § 727(a)(2)(A) requires proof of four elements: (1) a transfer or concealment of property; (2) belonging to the debtor; (3) within one year of the filing of the petition; and (4) done with intent to hinder, delay, or defraud a creditor or officer of the estate. In re Pratt, 411 F.3d 561, 565 (5th Cir. 2005). A presumption of actual fraudulent intent necessary to bar a discharge under 11 U.S.C. § 727(a)(2)(A) arises when a debtor transfers property gratuitously or to relatives. In re Chastant, 873 F.2d 89 (5th Cir. 1989).

Debtor's creation of a trust for his children creates a presumption of an intent to defraud establishing the plaintiff's prima facie case under 11 U.S.C. § 727(a)(2)(A), shifting to the debtor the burden of demonstrating that he lacked fraudulent intent. In re Chastant, 873 F.2d 89 at 91. Transfer of record title to debtor's home and debtor's continued retention of a secret beneficial interest therein constitutes continuing concealment with "intent to hinder, delay, or defraud a creditor" for purposes of 11 U.S.C. § 727(a)(2)(A). In re Olivier, 819 F.2d 550, 555 (5th Cir.1987). Concealment of property can be established by showing a transfer of title coupled with the retention of the benefits of ownership. In re Bradley, 501 F.3d 421 (5th Cir. 2007). The concealment of an interest in an asset that continues, with the requisite intent, into the year before bankruptcy constitutes a form of concealment which occurs within the year before bankruptcy. Id.

To establish a false oath under 11 U.S.C. § 727(a)(4)(A), the creditor must show that: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the

statement related materially to the bankruptcy case.  In re Pratt, 411 F.3d at 566. An omission

of an asset can constitute a false oath. Id.  The subject matter of a false oath is material if it

bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery

of assets, business dealings, or the existence and disposition of his property.  Id.

## VI.  Bank Accounts

In his schedules filed November 3, 2004, Neely claimed to have no financial accounts

or cash on hand.  Although he claimed to have no accounts, Neely disclosed earnings of

$15,000 monthly from the operation of his law office.

In his chapter 7 meeting of creditors conducted on February 17, 2005, Neely testified

that he "probably forgot" to schedule his financial accounts:

| | |
|---|---|
| Smith: | You have no bank accounts? |
| Neely: | Yes. |
| Smith: | Why aren't they on there? |
| Neely: | I probably forgot to put them on there. |
| Smith: | I want all of your bank accounts, any in which you have signatory authority or which are in your name.  That would include IOLTA accounts, firm accounts, personal accounts -- |
| Neely: | Okay. |
| Smith: | – wife's accounts. |
| Neely: | Okay. |

(Neely, February 17, 2005, chapter 7 meeting of creditors,  p. 33, l. 9  - l. 20).

Neely filed amended schedules on March 17, 2005, disclosing two accounts at Frost

National Bank accounts purportedly for his law practice,  accounts number 490004103 and

490010480.  Despite his trustee's admonishment to include his wife's bank accounts, Neely

did not disclose any accounts held in his wife's name.  At his December 13, 2006 chapter 13

meeting of creditors, the chapter 13 trustee inquired whether Neely's wife had any bank

accounts.  Neely testified:

| | |
|---|---|
| Wong: | Schedule B, the only bank accounts you've listed are two – are they business accounts? |
| Neely: | Yes, ma'am. |
| Wong: | Does your wife have any bank accounts? |
| Neely: | Yes, I believe she does. |
| Wong: | How long have you and your wife been married? |
| Neely: | Eight – eight years. |
| Wong: | How many bank accounts does she have in her name? |
| Neely: | I think she has two, one or two. |
| Wong: | Are you a signatory on any of those accounts? |
| Neely: | No, ma'am, never have been, nor has she been a signatory on any of mine. |

(December 13, 2006 chapter 13 meeting of creditors p. 14, l. 10 - l. 2).

On the date of bankruptcy, Neely had an account at Frost National Bank, account

number 492009447 [447], held under the name "Cindy D. Neely FBO Winston R. Neely

Special Separate (sic) Account."  When asked whether account number 447 is her account at

Frost National Bank or whether she has another account, Cindy Neely testified, "I have no

idea." (Cindy Neely deposition, p.107, l.7 - 16).  When asked what was the source of the

funds on deposit in account 447, Cindy Neely testified, "I have no idea.  I don't know."(Cindy

Neely deposition p. 108, l.4 - 6).

Despite Neely's testimony at his chapter 13 meeting of creditors on December 13,

2006, that he was not a signatory on account number 447, the Court finds that Neely signed

Cindy Neely's name to numerous checks drawn on account number 447.  Neely treated the

account as his own for all purposes. Among the copies of checks from the records of account number 447 are checks to the therapists and caregivers Cindy Neely hired to care for the couple's children. (Plaintiff's Ex. 37). Cindy Neely testified that George Neely wrote checks to pay the therapists and caregivers she hired and that she never wrote any checks to pay them. (Cindy Neely deposition, taken December 19, 2007, p. 94, l. 20 - p. 95, l. 4 and p. 98, l. 8 - p. 99, l. 2).

In April 2004, account number 447 had a balance on deposit of $33,584. During the six months prior to bankruptcy, Neely deposited $19,386 and withdrew $52,415 from this account leaving a balance of $653.53, as of October 19, 2004, the date of bankruptcy. In the three years following the date he filed bankruptcy, through September 14, 2007, Neely deposited a total of $147,222 and withdrew $147,668 from the same account.

The Court finds that the funds on deposit in account number 447 prior to, on the date of, and following Neely's bankruptcy filing, were the personal property of Neely derived from his earnings. The funds were not the separate property of Cindy Neely. As account number 447 held Neely's earnings on the date he filed bankruptcy, Neely should have disclosed the existence of the account in his initial schedules filed with the court. The Court finds that Neely intentionally hid the existence of account number 447 and the source of funds on deposit in that account from his bankruptcy trustees and his creditors.

(December 13, 2006, chapter 13 meeting of creditors, p. 43, l. 14 - p. 49, l. 2).

Soon after initiating his bankruptcy, on January 20, 2005, Neely opened account number 492012057 [057] at Frost National Bank, in the name of "Southern Cheyenne Trust, George R. Neely, Trustee." The Court finds that just as with account number 447, Neely used account number 057 as his personal account. On January 25, 2005, Neely deposited the proceeds from his sale of 4503 Montrose, in the amount of $306,956.31, into the account. However, on December 13, 2006, the day of his chapter 13 creditors meeting, he had reduced the account balance below $100.

Neely testified at his December 13, 2006 chapter 13 meeting of creditors about his children's trust account on which he was the sole signatory:

| Molleston: | Mr. Neely, of what trusts are your children beneficiaries? |
| Neely: | I think the only one that you're aware of, which is the Southern Cheyenne Trust. |
| Molleston: | Okay, but that doesn't answer my question. I know what I'm aware of. I'm asking you, of what trusts are your children beneficiaries? |
| Neely: | Well, and my answer stands. To my knowledge, the only trust that I'm aware of that my children are beneficiaries of is the Southern Cheyenne trust. |
| Molleston: | How much money is in the Southern Cheyenne Trust? |
| Neely: | None. |
| Molleston: | How much money went from the Southern Cheyenne Trust to pay Joel Kay or his law firm? |
| Neely: | I don't know. |
| Molleston: | Did some money go from the Southern Cheyenne Trust to make those payments? |
| Neely: | I don't recall. |
| Molleston: | You don't recall? |
| Neely: | No. |
| Molleston: | Where are the records, the checking account records for Southern Cheyenne Trust? |
| Neely: | I don't know. They're probably in storage somewhere. |

| | |
|---|---|
| Molleston: | Do you have a storage building? |
| Neely: | I don't have a storage building. |
| Molleston: | Where do you have a storage facility? |
| Neely: | Well, it could either be down at the property in Rosenberg or – I don't know. |
| Molleston: | You don't know? |
| Molleston: | You don't know? |
| Neely: | No, I haven't been asked to look for them. |
| Molleston: | At what bank were those checks issued? |
| Neely: | Well, I think, as you were told last time, I think it was Frost National Bank. |
| Molleston: | Frost National Bank. |
| Neely: | Frost National Bank. |
| Molleston: | Do you know the account number of the Southern Cheyenne Trust? |
| Neely: | No, I do not. |
| Wong: | Were you a signatory on that account? |
| Neely: | Yes, ma'am. |
| Wong: | And what position did you hold in that trust? |
| . . . . | |
| Neely: | . . . On the 14th after, or whatever it was, when I filed the Chapter 7, my brother resigned as trustee and I was appointed trustee. |
| Wong: | Who else is a beneficiary of that trust? |
| Neely: | I think just the children. |
| . . . . | |
| Molleston: | Okay.  And where did the money go that was put into the Southern Cheyenne Trust starting in 2003? |
| Neely: | Starting in 2003?  I don't know.  If there was any, I wasn't trustee on that until November 2004.  So anything that happened before that, I'm not sure. |
| Molleston: | Well, what about after that? |
| Neely: | Well, I don't really recall where all it went. |
| Molleston: | Did you pay your attorney, Tom Watkins, or his law firm, with money from the Southern Cheyenne Trust? |
| Neely: | I don't recall. |
| Molleston: | You don't recall? |
| Neely: | No, I don't recall. |
| Molleston: | Do you recall where those checks are that would show how that money was disbursed? |

Neely:        No, I don't.

The evidence shows Neely used account number 057 to hide hundreds of thousands of dollars of proceeds of real property he owned prior to his bankruptcy filing in order to funnel those funds into improvements of his property in Rosenberg, Texas.

In addition to Neely's transfer on January 25, 2005, of proceeds in the amount of $306,956.31, into account number 057, from his sale of 4305 Montrose, he also transferred on April 25, 2005, $252,306.30, from a loan for which he pledged 705 Avondale, and on July 5, 2005, he transferred $176,954.64, from his sale of 705 Avondale into the same account. In addition, despite claiming that account number 057contained only trust funds administered for the benefit of his children,  account records reflect that Neely transferred thousands of dollars of "trust" funds  from the "trust" account into account number 4103 for his law firm.

Despite the fact that Neely opened the account and was the sole signatory on the account, Neely testified at his December 13, 2006, chapter 13 meeting of creditors, that he did not know and did not recall what had happened to the funds of account number 057. Neely testified that he did not know whether any bank records existed that might explain the disposition of those funds.

The Court finds that regardless of the manner in which account number 057 is styled, the contents of the account are not deposits of trust funds or of the separate property of Cindy Neely.  The funds deposited in account number 057 were the proceeds of real properties

Neely owned in his individual capacity prior to bankruptcy and were property of the bankruptcy estate.

## VII. 4503 Montrose

For five years, from March 2000 to March 2005, Neely operated his law office at 4503 Montrose.[1]  Neely sold 4503 Montrose to Charles B. Musselwhite, Jr. on January 27, 2005. Only three weeks after the sale, Neely appeared at his chapter 7 meeting of creditors on February 17, 2005, and testified as follows regarding 4503 Montrose:

| | |
|---|---|
| Smith: | You have down as your address 4503 Montrose Boulevard.  Is that your place of business or your place of residence? |
| Neely: | That was my place of business. |
| Smith: | And that's past tense? |
| Neely: | Correct. |
| Smith: | Has that – was that being leased? |
| Neely: | Yes. |
| Smith: | And is that lease terminated? |
| Neely: | Yes. |

(Neely, February 17, 2005, chapter 7 meeting of creditors, p. 8, l. 11 - l. 20)

| | |
|---|---|
| Molleston: | One other question, Mr. Neely.  Who owns the property at 4503 Montrose Boulevard, Houston? |
| Neely: | An attorney by the name of Charles B. Musselwhite, Benton Musselwhite's son. |
| Molleston: | And did you lease from Mr. Musselwhite? |
| Neely: | No. |
| Molleston: | Who leased from Mr. Musselwhite so that you could occupy the 4503 Montrose property? |
| Neely: | He owns it now.  I leased it from the prior owner. |
| Molleston: | Who was the prior owner? |

---

[1] Being all of Lot Twelve (12) and the North one-half (½) of Lot Eleven (11) in Block Forty-Six (46) of Roseland Addition, a subdivision in Harris County, Texas, according to the map or plat thereof, recorded in Volume 306, Page 164 of the Deed Records of Harris County, Texas.

| Neely: | My children's trust. |
| Molleston: | Okay. And when did your children's trust sell that property to Mr. Musselwhite? |
| Neely: | Recently. |
| Molleston: | Do you know the date? |
| Neely: | No. |
| Molleston: | Do you know the month? |
| Neely: | It was during January of this year. |
| Molleston: | During the time that you were in bankruptcy? |
| Neely: | It was after I filed for Chapter 7 bankruptcy, yes. |
| Smith: | Is this the Southern Cheyenne Trust or is it another trust? |
| Neely: | Yes, sir. |
| Smith: | I want to see everything there is in that trust. |
| Neely: | Okay. |

(Neely, February 17, 2005, chapter 7 meeting of creditors, p. 51, l. 9 - p. 52, l. 13.)

Neely testified on December 13, 2006 at the chapter 13 meeting of creditors, about

4503 Montrose:

| Neely: | . . . So the house was sold because 2004 was probably the worst financial year I ever had in my life. . . . We didn't make any money, hardly. |
| Wong: | So what did you do with the sales proceeds – |
| Neely: | The sales proceeds were – |
| Wong: | – of that real estate? Did it go back in the trust? |
| Neely: | Went into an account for the trust, and then part of the money was used to buy a house that my parents owned that we had been living in. |
| . . . . | |
| Minor: | I have a couple of follow-up questions. In what year did Cindy transfer the 4303 – 4503 Montrose into the trust? |
| Neely: | I would be guessing, but I think it was either 2003 or 2003 she transferred it to my brother as trustee. |

(December 13, 2006 chapter 13 meeting of creditors p. 14, l. 7 - p. 74, l.6.)

Neely acquired 4503 Montrose on May 21, 1999, and on that date entered into a contract for improvements to the property in order to use the property as his law office. Neely acquired 4503 Montrose in the name of Cindy Neely.  The deed with which Neely acquired the property recites that the conveyance is to "Cindy Diane Neely, a married person, as her sole and separate property" for the consideration of "ten dollars ($10.00)" and  "the execution and delivery by the Grantee of that one certain promissory note of even date herewith in the principal sum of twenty-five thousand and no/100 dollars ($25,000.00)." The vendor's lien was released in consideration of the payment of the indebtedness on November 15, 1999.  Neely contends that Cindy Neely purchased the property with her separate funds as her separate property.

A deed's recitation  that property is conveyed to a spouse as her sole and separate property creates a presumption that the property is her separate property.  Hodge v. Ellis, 277 S.W.2d 900, 904 (Tex. 1955).  The presumption, however, is rebuttable.  Id.

Property acquired on the credit of the community is community property.  Gleich v. Bongio, 99 S.W.2d 881, 883 (Tex. 1937).  A question of fact is raised as to the character of the property when a deed to a spouse recites that the property is conveyed on credit as separate property and the documentary evidence fails to reflect an express agreement by the lender to look only to the purchasing spouse's separate estate for payment.  Glover v. Henry, 749 S.W.2d 502 (Tex.App.-Eastland,1988.)  Evidence of some  "understanding" between the lender and a spouse is insufficient to rebut the presumption that property acquired during

marriage is community property absent proof that the lender expressly contracted for repayment solely from one spouse's separate property. <u>Broussard v. Tian</u>, 295 S.W.2d 405 (Tex. 1956). The Court finds that there is no proof of a contract by the sellers to look solely to the separate property of Cindy Neely for repayment of the $25,000 indebtedness.

Cindy Neely graduated from college in 1993, began working for Neely at his law firm in 1994, and married Neely in 1998. At the time Neely filed bankruptcy, Cindy Neely was unemployed and had been for several years. Cindy Neely's mother died in 1995. Since Cindy Neely testified that she does not remember whether she inherited any money upon the death of her mother, and, as there is no evidence of any inheritance, the Court finds that Cindy Neely did not inherit any funds upon the death of her mother. Cindy Neely, likewise, does not remember whether she has received more than nominal sums from her father or other family members since graduating from college. Cindy Neely does not remember what she earned from 1998 through 2000, testifying, in response to questioning concerning the couple's income ranging from $34,233 to $45,323 shown on the couple's tax returns for those years, " This is my income that I made because George wasn't working; he was suspended. So apparently that's my income. I assume it's accurate. I don't know. I mean, how am I supposed to know that?"(Cindy Neely deposition p. 104, 1.2 - 14)

Cindy Neely testified that she remembered purchasing the Montrose property, but does not remember where she obtained the funds to acquire the property, does not remember the purchase price, does not remember where she banked at the time of the purchase, does not

remember attending a closing for the purchase, and does not remember paying the $25,000 vendor's lien note recited in the deed. (Cindy Neely deposition p.50, l. 1 - 6; p. 52, l. 17 - 25; p. 54, l.12 - 25; p. 55, l. 1 - 11; p. 55, l. 23- 25; p. 56, l. 3- 13; p. 57, l.20- 25.)  Cindy Neely remembers, however, that George Neely did not give her the money to purchase the property. (p. 57, l. 25 - p. 58, l. 2).

The Court finds that George Neely purchased the property, arranged for title to appear in the name of Cindy Neely, and paid the vendor's lien note.  The Court finds that at the time he purchased the property in Cindy Neely's name, George Neely did not intend to make a gift of the property or of his community interest in the property to Cindy Neely.  The Court finds that George Neely intended to hide the true nature of his interest in the Montrose property by holding title in the name of Cindy Neely.

On July 3, 2003, Neely executed a deed to 4503 Montrose in Cindy Neely's name as her "sole and separate property" purporting to transfer the property to Windell Neely, Trustee. (Ex. 5).  The deed recites that it was executed on the "date first set forth above," but there is a blank where that date should appear.  The notary's acknowledgment on the deed is incomplete, leaving blank the identity of the person appearing before the notary to sign the deed.  The Court finds that Neely himself executed the deed in Cindy Neely's name and recorded it.

To effect a transfer of trust property to a trustee under Tex. Prop. Code § 112.004(1), the transfer must divest the trustor of all dominion and control over the trust res.  <u>Ayers v.</u>

Mitchell, 167 S.W.3d 924 (Tex.App.-Texarkana 2005). From the date Neely purchased 4503 Montrose until the date he sold the property to Musselwhite, Neely exercised total dominion and control over the property.

To effect a transfer of title to property by deed, the grantor must execute and deliver the deed with the intent that the deed is to be operative as a conveyance. Stephens County Museum, Inc. v. Swenson, 517 S.W.2d 257, 261 (Tex. 1974). A prima facie case of delivery and a presumption that the grantor intended to convey the land according to the terms of the deed is established when it is shown that the deed has been filed for record. Id. This presumption that the delivery has been accompanied by the requisite intent that it is to become operative as a conveyance may be overcome by showing (1) that the deed was delivered or recorded for a different purpose, (2) that fraud, accident or mistake accompanied the delivery or recording, or (3) that the grantor had no intention of divesting himself of title. Id. The question of delivery of a deed, being controlled by the intent of the grantor, is determined by examining all the facts and circumstances preceding, attending and following the execution of the instrument. Id. at 261-262. Signing, acknowledging and recording a deed are acts tending to show the intent to convey title, but none is conclusive proof of such intent. McCartney v. McCartney, 55 S.W. 310 (Tex. 1900). The effect of such acts as evidence of intent may be rebutted. Id. Where other evidence tends to show that such actions were done, not with intent to pass title, but for another purpose, an issue of fact is raised. Id. Where the grantee gives no consideration to the grantor, or any right of third parties acquired based

on the acts of the grantor, there is no question of estoppel. Id. When a recorded deed is not actually delivered, but retained by the maker, the maker may show that the recordation was not intended to take the place of delivery or to give effect to the conveyance. Koppelmann v. Koppelmann, 57 S.W. 570 (Tex. 1900). The effect of a recorded deed depends upon the intent with which the acts taking the place of actual delivery were done. If such acts were not done for the purpose of completing the conveyance of title, the deed is inoperative. Id. If there is no execution of the deed, grantor retains title without need of a court decree restoring it. Id.

The Court finds that the deed transferring the property from "Cindy Neely" to the grantee, Windell Neely, Trustee, was never delivered to the grantee. Although he signed and recorded the deed, George Neely never delivered the deed to Windell Neely and never intended to part with legal or equitable title to 4503 Montrose , and never intended to place the property in trust. Neely's deed in the name of Cindy Neely to Windell Neely, Trustee, did not pass legal or equitable title to 4503 Montrose to Windell Neely in any manner.

A trust in either real or personal property is enforceable only if there is written evidence of the trust's terms bearing the signature of the settlor or the settlor's authorized agent. Tex. Prop. Code Ann.§ 112.004. The deed purporting to transfer 4503 Montrose to Windell Neely, Trustee, signed by George Neely, in the name of Cindy Neely, fails to create a trust. To create a trust by a written instrument, the beneficiary, the res, and the trust purpose must be identified. Pickelner v. Adler, 229 S.W.3d 516 (Tex. App.-Houston [1 Dist.] 2007).

When an essential term is altogether missing from an attempted express trust, or is not at least reasonably certain, that term cannot be supplied by parol evidence, and the trust will fail. Id. The deed to Windell Neely, Trustee, names neither beneficiary nor purpose. Therefore, it fails as an express trust.

On November 16, 2004, Windell Neely, Trustee, signed a deed to 4503 Montrose purportedly conveying 4503 Montrose to George R. Neely, Trustee (Southern Cheyenne Trust) (Ex. 6). The Court finds that George Neely had this deed signed and recorded to make it appear that the deed he had signed in the name of Cindy Neely granting the property to Windell Neely, Trustee, had in fact been delivered to Windell Neely, Trustee. The Court finds that the deed of 4503 Montrose by Windell Neely, Trustee,  to George R. Neely, Trustee, did not effect a transfer of title of 4503 Montrose to Neely or to a trust as title never left Neely from the time of his initial acquisition of the property.

The Court finds, when Neely filed bankruptcy, he owned 4503 Montrose in his individual capacity. Once Neely filed his chapter 7 petition, 4503 Montrose became property of the bankruptcy estate. Neely did not schedule his ownership of 4503 Montrose. The Court finds that Neely intentionally omitted 4503 Montrose from his schedules and intentionally misled the trustee and his creditors about the nature of his interest in 4503 Montrose. Furthermore, Neely had no authority to dispose of property of the bankruptcy estate by selling 4503 Montrose to Musselwhite.

## VIII. 705 Avondale

The day after the Neelys married in 1998, they moved into 705 Avondale where they lived for six years until mid-2005.[2] Neely sold 705 Avondale in July 2005. On February 17, 2005, in his chapter 7 meeting of creditors, Neely testified that 705 Avondale was not his residence or the residence of anyone else and that he only maintained an office there.

| | |
|---|---|
| Molleston: | Mr.. Neely, are you familiar with the property located at 705 Avondale, Houston, Texas? |
| Neely: | Yes, I am. |
| Molleston: | And by whom is that property owned? |
| Neely: | It is currently – it used to be owned by my parents. |
| Molleston: | Okay. By whom is it owned now? |
| Neely: | By an entity by the name of Southern Cheyenne Trust. |
| Molleston: | And who are the principals of Southern Cheyenne Trust? |
| Neely: | Well, I represent them as their attorney. It's attorney/client privilege. But it is a trust that the beneficiaries are my children. |
| Molleston: | Who resides at 705 Avondale? |
| Neely: | That is also an office for me. |
| Molleston: | It's an office for you? |
| Neely: | It's an office for me, too. |
| Molleston: | Is it a residence for anybody? |
| Neely: | No. We stay there when we're in town, except on the weekend when we go home to Rosenberg, because my son is currently involved in Texas Children's Bridges School Program for Autism. And so on Monday, Tuesday, Wednesday and Thursday, it's an old house, it's a large house. I have an office there, as well as there are accommodations for us to stay there as well during the week. |
| Molleston: | Okay. So the weekends you go to Rosenberg? |

---

[2]The real property is described as:

The East 33 1/3 feet of Lot 6 and the West 33 ½ feet of Lot 7, in Block 4 of Amended Montrose Addition, a subdivision in Harris County, Texas, according to the map or plat thereof, recorded in Volume 5, Page 32, of the Map records of Harris County, Texas, also described as TRS 6 & 7A BLK 4 (001*E 2/3 of LT 6 W 7 TR 21), Montrose, 705 Avondale St., Houston, Texas 77006.

Neely:        Well, whenever he's not in school, that's where we are.

(Chapter 7 meeting of creditors, February 17, 2005, p. 41, l. 15 - p. 42, l. 22).

Neely claims his parents owned 705 Avondale until they conveyed title, after Neely

filed bankruptcy, by a deed dated January 11, 2005, to "George R. Neely, Trustee, Southern

Cheyenne Trust" to hold in trust for his children. ( Ex. 8).

| | |
|---|---|
| Smith: | . . . I take it your parents are deceased? |
| Neely: | No. |
| Smith: | It was just transferred from your parents into a trust? |
| Neely: | Yes. |
| Smith: | And you're the attorney for the recipient? |
| Neely: | Correct. |
| Smith: | So you've got you as trustee of the trust and you're the attorney for the trust, being "I have the attorney/client privilege"? Okay, send me those documents. |
| Neely: | Okay. |

(Neely, February 17, 2005, chapter 7 meeting of creditors,  p. 41, l. 15 - p.43, l. 14).

In his chapter 13 meeting of creditors held December 13, 2006, Neely testified that he

used the proceeds from the sale of 4503 Montrose to purchase 705 Avondale from his parents:

| | |
|---|---|
| Neely: | So the house was sold because 2004 was probably the worst financial year I ever had in my life. . . . We didn't make any money, hardly. |
| Ms. Wong: | So what did you do with the sales proceeds– |
| Mr.. Neely: | The sales proceeds were – |
| Ms. Wong: | – of that real estate?  Did it go back in the trust? |
| Mr. Neely: | Went into an account for the trust, and then part of the money was used to buy a house that my parents owned that we had been living in. |
| Ms. Wong: | So the trust owns that house – |

Mr.. Neely:   The trust owned that house. The trust later sold that house and paid off the mortgage and used part of the money to do a lot of stuff for our kids and to refinish the second house down on the property in Rosenberg, which we plan on using as a treatment facility center kind of thing for my son's autism classes, among other things.

(Neely testimony December 13, 2006, chapter 13 meeting of creditors, p. 72, l.5 - p.73, l.2.)

The Court finds that as 4503 Montrose was property of the bankruptcy estate when Neely filed his chapter 7 bankruptcy petition, Neely used the proceeds of property of the bankruptcy estate to purchase 705 Avondale. In April 2005, Neely pledged 705 Avondale to Noble Mortgage & Investments, LLC in exchange for a loan in the amount of $267,000.00. (See Ex 9). Neely deposited those loan proceeds into Frost National Bank account number 057 and, subsequently, used those funds to improve his Rosenberg property. Thereafter, Neely sold 705 Avondale, depositing the proceeds into account number 057 for use improving his Rosenberg property.

## IX. Rosenberg Property

After selling 705 Avondale in July 2005, the Neelys moved from that house to the property in Rosenberg, Texas. By funneling his earnings and proceeds from his sales of property of the bankruptcy estate, Neely, who testified that the Rosenberg property was purchased for $120,000, caused the property's value to increase, according to his schedules, from its October 2003 purchase price, to a value of $662,000.00 as of March 17, 2005, and a value of $839,160.00, as of May 12, 2006.

Neely testified that Cindy Neely purchased the Rosenberg property with her separate funds in October 2003.

| | |
|---|---|
| Smith: | Well, let's go into this.  You're claiming a one-half interest in the property and you're not claiming the other one-half interest? |
| Neely: | No. |
| Smith: | Is there a mortgage? |
| Neely: | No. |
| Smith: | How much did she pay for it when she bought it in 10/03? |
| Neely: | There are delinquent property taxes due on it to Fort Bend County. |
| Smith: | How much? |
| Neely: | Approximately 60 to 70 thousand dollars. |
| . . . . | |
| Smith: | Okay.  So a hundred percent of the property was conveyed to your wife for the 77,000 and the 40,000? |
| Neely: | Okay. |

(Neely, February 17, 2005, chapter 7 meeting of creditors,  p.11, l. 25 - p. 12, l. 12 ; p. 29, l. 10 - l. 13).

Neely testified to the source of Cindy Neely's funds to purchase the Rosenberg property.  Neely testified that although Cindy Neely was unemployed in 2003, she had the funds to purchase the Rosenberg property from her earnings, her savings, her family, and from a partition agreement executed by the couple:

| | |
|---|---|
| Smith: | . . . And where do you reside? |
| Neely: | 1925 FM 723 in Rosenberg, Texas. |
| . . . . | |
| Smith: | And you're claiming only 40 percent of all property? |
| . . . . | |
| Neely: | Okay. Yeah, I'm claiming half interest in the property as a homestead. |

| | |
|---|---|
| Smith: | Who's claiming the other half? |
| Neely: | My wife. |
| Smith: | All community property comes into the estate. |
| Neely: | Well, I'm not sure that it's community property. |
| Smith: | What do you think it is? |
| Neely: | It's the subject of currently pending state court litigation. My wife bought that with her separate proceeds in October of 2003. |
| Smith: | Okay. And what is your wife's source of income? |
| Neely: | She is now unemployed. She's a housewife. |
| Smith: | How was she employed when she bought it in 10/03? |
| Neely: | She was unemployed when she bought it in 10/03. |
| Smith: | Where did she get the money? |
| Neely: | From her separate account. |
| Smith: | Where's her separate account? |
| Neely: | Where is it? |
| Smith: | Yeah. |
| Neely: | It was at Frost National Bank. |
| Smith: | What was the basis of the deposit in the account that led to the ability to buy the property in 10/03? |
| Neely: | I'm not really at liberty to talk about that. I mean, it's my wife's stuff. I represent her in a lot of stuff, a lot of different things. |
| Smith: | Well, you're going to have to answer that. |
| Neely: | Well, part of it was money that she had earned and saved, part of it was from her family, and part of it was money that we had partitioned between ourselves. |
| Smith: | And the partition occurred when? |
| Neely: | I don't remember. Over the years. |
| Smith: | Mr.. Neely – |
| Neely: | Steve, I understand -- |
| Smith: | – we're going to go through all this so, -- |
| Neely: | I understand, but I don't remember. |
| Smith: | Well, you do have partition agreements in writing? |
| Neely: | We did, yes. |
| Smith: | Are you saying you no longer have them? |
| Neely: | Well, I don't know where it is now. |
| Smith: | Were they recorded anywhere? |
| Neely: | I don't know. |

(Neely, February 17, 2005, chapter 7 meeting of creditors, p. 9, l. 6 - p. 11, l. 24).

At his December 13, 2006 chapter 13 meeting of creditors, Neely again testified about the existence of a partition agreement:

| Wong: | Is there a written partition agreement on the marital estate? |
| Neely: | Yes, there is.  There was one. |

(December 13, 2006 chapter 13 meeting of creditors p.15, l.3 - l. 5).

Neely never filed any partition agreement in this case.  A partition agreement must be in writing and signed by both parties.  Tex. Family Code § 4.104.  The Court finds that no partition agreement exists.

Cindy Neely's testimony concerning her finances makes clear that at no time did she have any funds from her family, her savings, or from her previous employment with which to purchase the Rosenberg property as her separate property.  The Court finds that community funds were used to purchase the Rosenberg property.

During the course of Neely's bankruptcy, litigation to determine the rights of various parties to the Rosenberg property proceeded in state court.  That litigation resulted in a judgment that Cindy Neely owns a portion of the Rosenberg property as her special separate property for the benefit of the Neelys' son.  Although the Court gave Neely an opportunity to include the pleadings from the state court litigation for purposes of evaluating whether res judicata would apply to the state court judgment, Neely has not submitted the pleadings from

that case.[3]   Absent pleadings from the state court case placing the separate or community

nature of Cindy Neely's interest in the Rosenberg property at issue in that case, the Court

finds that the state court judgment's characterization of Cindy Neely's interest in the property

as separate has no res judicata or collateral estoppel effect in the instant matter.

## X. Patent

In October 2001, Neely took an assignment of patent no. 5858449 from C & D

Brokerage Company, Inc.  Neely testified on  December 13, 2006 chapter 13 meeting of

creditors about the patent:

| | |
|---|---|
| Wong: | Was that a patent your wife had owned? |
| Neely: | Yes, it is a patent.  Okay, the story to that is this: I represented some people who were involved in some litigation up in a real cold place in Iowa that I don't ever want to go back to. |
| Wong: | So they gave you an interest in the patent? |
| Neely: | And so part of my fee was money from a bankruptcy out there, which was about a hundred thousand dollars and this half interest, domestic interests in this patent, this soybean patent, which is kind of like the motherhead of all soybean patents that DuPont has now that they are sharing with Bungee and Solae.  Anyway, so the kids own the patent.  I don't know if it's worth any value.  There was a contract that goes along with it, and DuPont says that they may owe some royalties under, but we haven't gotten around to litigating that. |
| Wong: | Okay. |
| Neely: | My opinion is the patent may be worth, well -- |
| Wong: | Who knows. |
| Neely: | It could be worth who knows.  If the contract rights are as I believe they are worth, it could be – you know, those |

---

[3]Of interest to this Court was whether the Neelys' community property rights in the Rosenberg home were even at issue in that state case.

> contracting patent rights could be worth millions of
> dollars.

(Chapter 13 meeting of creditors, December 13, 2006, p. 71, l.1 - p. 72, l. 4).

Neely purports to have executed an assignment of the patent to Cindy Neely in trust for the benefit of the couple's son on May 1, 2002. The assignment executed by Neely states, " I, George R. Neely, do hereby assign to Cindy D. Neely for the benefit of Wxxx R. Neely, any and all right, title and interest in and to the patent . . ."   The document contains a jurat executed by George R. Neely that is stamped with a notary seal stating, "Cindy D. Blazik My Commission Expires May 19, 2002."  Blazik is Cindy Neely's maiden name.  Cindy Neely testified that she stopped working in Neely's office once he hired Ginny Ploch. (Cindy Neely deposition p. 30, l. 7- 9).  Ginny Ploch's notary seal appears on the patent assignment from C & D Brokerage Company, Inc. to Neely executed October 8, 2001. A notary's term in Texas expires four years from the date of the notary's appointment.  The Court finds that Cindy Neely did not notarize the assignment to herself to hold the patent in trust. "One who is financially and beneficially interested in a transaction is disqualified from taking an acknowledgment concerning the transaction." Dyson Descendant Corp. v. Sonat Exploration Co., 861 S.W.2d 942 (Tex.App.-Hous. [1 Dist.],1993.)   The Court finds that Neely himself applied the notary seal to his "assignment" of the patent, using an invalid discarded notary seal left by Cindy Neely when she ceased working in Neely's office.  By retaining and using a discarded notary seal, Neely could give a back-dated document an appearance of authenticity and could avoid actually appearing before a notary who would be required by law

to maintain an accurate record of documents notarized along with the identities of those persons appearing before the notary to sign documents. The Court finds that Neely used a "Cindy Blazik" notary stamp discarded by Cindy Neely after her marriage to him, in order to make it appear that he had assigned the patent in 2002. The Court finds Neely created the "assignment" at a later date to make it appear that the notary was different from the assignee of the patent and to avoid appearing before a legitimate notary. The Court finds that despite the assignment, Neely never intended to part with ownership of the patent or to place the patent in trust for the benefit of his son. The Court finds that the assignment did not transfer ownership of the patent from George Neely to anyone else, that Neely owned the patent on the date he filed bankruptcy, and that he failed to schedule the patent.

## V. The Trust

Neely testified December 13, 2006 chapter 13 meeting of creditors about the formation of his children's trust:

| | |
|---|---|
| Wong: | Where did that Southern Cheyenne Trust originate from? |
| Neely: | The Southern Cheyenne Trust originated from a trust that my wife set up for the kids. She owned the – she bought that office building. It was an old house at 4503 Montrose Boulevard. And at the time that I was looking for some place to office, I was going to – Ed pankau and I were officing downtown and I didn't wasnt [sic] to office downtaown any more. She said "Okay, I'll let you use that, but you know, you pay for redoing it." |
| Wong: | Right. |
| Neely: | And so I said, okay, fine. So she owned it, I redid it, and so I officed there. And then she wanted to – then she put it in the trust for the kids. |
| Wong: | Okay. |

| Neely: | And the kids – then my brother was appointed trustee. He does stuff for the government through Boeing that we can't talk about. |
| Wong: | Right. |
| Neely: | And so when all this litigation -- |
| Wong: | He needed to get off of it? |
| Neely: | He needed to get off of it. |
| Wong: | Right. |
| Neely: | So he said, you know, "Tag, you're in. I'm like, "I don't want to be in," And he said, "It's your wife, you take it." So he resigned, made me trustee -- |
| Wong: | Do you know what year that was? |
| Neely: | That was in the end of '04, November of 2004. At that time, the only assets from the trust – I don't know if the assets were in the trust at the time. The only assets that I know that the trust had probably at that time or about that tine was that house on Montrose and a patent that is shared with DuPont on soybean – |

(December 13, 2006 chapter 13 meeting of creditors, p. 69, l. 13 - p. 70, l. 25).

On November 12, 2004, James C. Mulder, attorney at law, e-mailed to George R. Neely, trust documents creating the Southern Cheyenne Trust. (Ex. 12). The trust instrument purports to create a trust as to which Cindy Neely is settlor, her children are beneficiaries, and Windell Neely is trustee. At debtor's direction, Mulder backdated the trust instrument to make it appear that the trust instrument was signed on February 1, 2002. The backdating of the trust instrument is shown by Mulder's own e-mail accompanying the documents and by the language in Section 1.06 of the trust instrument, "I have two children. Their names and dates of birth are: Wxxx Rxxx Neely, born on xxxxx, 2001, and Gxxx Rxxx Neely, born on xxxxx 2004." On the date of the trust's purported execution, February 1, 2002, Gxxx Rxxx Neely had not yet been born.

The trust instrument is signed on page 8-8 by Cindy Rose Neely, Settlor and Windell D. Neely, Trustee.  In her deposition, Cindy Neely testified that the name on the trust instrument was not her correct name, but nevertheless, she testified she had signed the instrument.  Attached to the trust instrument is a page containing three paragraphs, the first is entitled "Resignation of Trustee" and is signed by Windell D. Neely, Current Trustee dated November 18, 2004; the second is entitled "Acknowledgment of Resignation of Trusteeship" signed by Cindy Diane Neely, Settlor, dated November 16, 2004; and the third is entitled "Acceptance of Trusteeship" signed by George R. Neely, Successor Trustee, dated November 16, 2004.  In addition to the trust instrument and resignation, Windell Neely signed a deed to 4503 Montrose purportedly conveying that property to George R. Neely, Trustee (Southern Cheyenne Trust).

The Court finds that Windell Neely signed the trust instrument, the resignation as trustee, and the deed to George Neely, Trustee, on the same day.  Even assuming the trust instrument created a trust, the Court finds the trust was created no earlier than November 16, 2004.  Other than the "one dollar" that the trust instrument states is attached as the initial trust property, the Court finds that the trust has never owned any property.  The Court finds that no real or personal property has ever been transferred to the trust.  The Court finds that Neely owned 4503 Montrose individually, that he sold the property without court authority after bankruptcy, that he used the proceeds to purchase 705 Avondale from his parents post-petition without court authority, and that he ultimately used the proceeds of the loan for which

he pledged 705 Avondale and the proceeds of the sale of that property to improve the Rosenberg property. Despite his testimony, the Court finds that George Neely never lived at the Rosenberg property on the date he filed bankruptcy, and the Rosenberg property was not purchased with Cindy Neely's separate funds. Consequently, the Court finds that the Neelys' interest in the property was property of the bankruptcy estate and not exempt on the date of bankruptcy.

## Conclusion

The Court finds that Neely, with intent to hinder, delay, or defraud a creditor and his bankruptcy trustee transferred and concealed property of the debtor, within one year before the date of the filing of the petition and property of the estate after the date of the filing of the petition in violation of 11 U.S.C. § 727(a)(2)(A) and (B). The Court further finds that Neely knowingly and fraudulently, in connection with this case made a false oath or account and withheld from his bankruptcy trustee recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs in violation of 11 U.S.C. § 727(a)(4)(A) and (D). Based on the foregoing, the Court concludes that George R. Neely's discharge is **DENIED**.

A separate judgment denying the dischargeability of the Commission's judgments and denying the debtor's discharge will be entered.

Signed this __10__ day of __Oct__, 2008 at Houston, Texas.

KAREN K. BROWN
UNITED STATES BANKRUPTCY JUDGE